UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

BRIAN LATOUR,

                              Plaintiff

                    -against-

CITY OF NEW YORK, PRISON HEALTH SERVICES,
INC., COMMISSIONER JOSEPH PONTE, FORMER
CHIEF OF DEPARTMENT OF DOC WILLIAM P.
CLEMONS,   WARDEN  TURHAN  GUMUSDERE,
CORRECTION OFFICER ("C.O.") DWAYNE DUBOIS
(Shield #18771), C.O. PANTANO, C.O. CONTARRO,
C.O.   HANSON,   DEPUTY   RUGGERIO,   C.O.
ANDERSON (Shield # 17438), CAPTAIN SWAN (Shield
# 1104), REGISTERED NURSE TRACY SIMPSON-
MITCHELL,   PHYSICIAN   ASSISTANT   ("P.A.")
COOPER, TOMMY MICHAEL, DR. DAVID
ROSENBERG, P.A. CURT WALKER, AND JOHN
DOES ##1-20,

                              Defendants.
----------------------------------------------------------------------- x

**FIRST AMENDED
COMPLAINT AND JURY
DEMAND**

**15-CV-8767 (KPF)**

        Plaintiff BRIAN LATOUR, by his attorneys, Stoll, Glickman & Bellina, LLP, for his

First Amended Complaint alleges as follows:

## PRELIMINARY STATEMENT

        1.     This is a civil rights action in which Plaintiff seeks relief for the violation of his rights

under: the Fourteenth Amendment to the United States Constitution and secured by 42 U.S.C. §§

1983 and 1988; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132;

Title III of the ADA, 42 U.S.C. § 12181; Section 504 of the Rehabilitation Act ("RA"), 29

U.S.C. § 794; the laws and Constitution of the State of New York; and the laws of the City of

New York.

        2.     Plaintiff's claim arises from a series of incidents in September 2014, in which

employees of the New York City Department of Correction ("DOC"), of the New York City Department of Health and Mental Hygiene ("DOHMH"), and of Prison Health Services, Inc. ("PHS"), acting under color of law, were deliberately indifferent and negligent to Plaintiff's serious medical needs, deprived him of his right to substantive due process, and discriminated against him based on his mental disability.

3.     Plaintiff has a diagnosed mental illness, which DOC and PHS staff knew when Plaintiff arrived on Rikers Island.  Regardless, DOC and PHS staff failed to provide mental health treatment or to house Plaintiff in a dormitory where he could receive necessary services.  DOC and PHS staff ignored Plaintiff's pleas to receive his essential prescription medication and to be properly housed.  As a result of Defendants' gross misconduct, Plaintiff suffered severe emotional and physical pain while in the custody of the City of New York.

4.     Plaintiff seeks monetary damages (special, compensatory, and punitive) against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

5.     This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, Titles II and III of the ADA, Section 504 of the RA, the laws and Constitutional of the State of New York, and the laws of the City of New York.

6.     The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

## VENUE

7.     Venue is laid within the United States District Court for the Southern District of New York in that Defendants are located within the boundaries of the Southern District of New York,

and a substantial part of the events giving rise to the claim occurred on Rikers Island, which is within the boundaries of the Southern District of New York.

**PARTIES**

8.    Plaintiff BRIAN LATOUR is a citizen of the United States who resides in Kings County, New York.  At all times here relevant, he was a pretrial detainee held at Rikers Island.

9.    The City of New York ("CITY") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all DOC personnel.  In addition, senior officials in the Department are aware of and tolerate certain practices by subordinate employees in the jails, regardless of whether they are acting according to written policy.  These practices, which are wide-spread, long-tolerated and uncorrected, are deeply embedded in the DOC culture and therefore constitute unwritten policies or customs.  In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the DOC, and for ensuring that the DOC personnel obey the laws of the United States and the State of New York.

10.    At all times here relevant, the City of New York delegated to DOHMH the responsibility of providing medical care for pretrial detainees in the custody of the DOC.  DOHMH contracted with PHS to satisfy that responsibility.

11.    PHS is a private corporation that delivers healthcare and pharmaceutical services to jails and prisons across the country to over 185,000 prisoners and detainees.  For 15 years, PHS was the healthcare and pharmaceutical services provider for DOC jails.  At all times here relevant, PHS engaged in business in the State of New York and provided health care services on

behalf of the City, and is therefore subject to personal jurisdiction in this district.  PHS is sued in its individual corporate capacity.

12.   Defendant JOSEPH PONTE was, at all times here relevant, the Commissioner of the DOC acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  On information and belief, Ponte, as Commission of the DOC, is responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and is responsible for the training, supervision, and conduct of all DOC personnel, including the named Defendants in this action.  As Commissioner, Ponte is also responsible for the enforcement of DOC rules, and for ensuring that DOC personnel obey federal and state laws.

13.   Defendant WILLIAM P. CLEMONS was, at all times here relevant, the Chief of the Department of DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  As Chief of Department, Clemons was the highest ranking uniformed member of the DOC, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in all the DOC jail facilities.  He was also responsible for the care, custody, and control of all inmates in the DOC jails.

14.   Defendant TURHAN GUMUSDERE was, at all times here relevant, the Warden of the Anna M. Kross Center ("AMKC") within DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  As Warden of the AMKC, he was responsible for the care, custody, and control of all inmates, as well as the supervision of all staff, in AMKC.

15.   Defendants Ponte, Clemons, and Gumusdere are collectively referred to as the

"Supervisory Defendants."

16.    Correction Officer ("C.O.") DWAYNE DUBOIS, C.O. PANTANO (whose first name and shield number are unknown to Plaintiff), C.O. CONTARRO (whose first name and shield number are unknown to Plaintiff), C.O. HANSON (whose first name and shield number are unknown to Plaintiff), Deputy RUGGERIO (whose first name and shield number are unknown to Plaintiff), C.O. ANDERSON (whose first name and shield number are unknown to Plaintiff), and Captain SWAN (whose first name and shield number are unknown to Plaintiff) were, at all times here relevant, employees of the DOC, and as such were acting in the capacities of agents, servants, and employees of the City of New York.  On information and belief, the above-named individual defendants were involved in the deprivation of Plaintiff's constitutional rights and/or failed to intervene in the actions of their fellow employees.  They are sued in their individual capacities and are referred to as the "Individual DOC Defendants."

17.    Registered Nurse ("R.N.") Tracy SIMPSON-MITCHELL, Physician Assistant ("P.A.") COOPER (whose first name is unknown to Plaintiff), Tommy MICHAEL, Dr. David ROSENBERG, and P.A. Curt WALKER were at all times here relevant employees of PHS. They are referred to as the "Medical Defendants."

18.    All other individual defendants, including John Doe ##1-20, individuals whose names are currently unknown to Plaintiff, are employees of the DOC and/or PHS, and are sued in their individual capacities.

19.    At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## NOTICE OF CLAIM

20.   By Order of the Supreme Court of the State of New York, County of Bronx, dated July 9, 2015, Plaintiff was granted permission to file and serve late Notices of Claim with the New York City Office of the Comptroller.  Over 30 days have elapsed since the filing of those notices, and this matter has not been settled or otherwise disposed of.

## FACTUAL ALLEGATIONS

*Sept. 10-11, 2014: Plaintiff's Arrest, Arraignment, and Admission to Rikers Island*

21.   On September 10, 2014, Plaintiff Brian Latour was arrested.  The following day, he was arraigned in Manhattan Criminal Court and bail was set.  Because Mr. Latour could not afford to post bail, he was placed in the custody of the DOC.  The judge adjourned the case until September 15, 2014.

22.   Mr. Latour arrived at the AMKC Main Intake area at Rikers Island at approximately 4:50 P.M. on September 11, 2014.  He was placed in a holding cell with other inmates awaiting transfers to housing units.

23.   Mr. Latour had a history of mental health problems and had previously received both in- and out-patient mental health treatment.

24.   The holding cell where Mr. Latour stayed was overcrowded, filthy, and infested with mice, vomit, feces, and cockroaches.

25.   He was not given bedding, a pillow, regular meals, clean clothes, or water.

*Sept. 12, 2014: Defendants Learn of Plaintiff's Disability and Develop a Treatment Plan*

26.   On September 12, 2014, Plaintiff was transferred to the medical clinic, where DOC and PHS staff interviewed him at length.

27.   PHS employee Jeanty Francois, P.A., filled out an intake form for Mr. Latour.  She

noted he suffers from bipolar disorder and that he required hospitalization as recently as August 2014. She also noted that he had attempted to kill himself three times and was taking four different prescriptions medications to manage his illness. P.A. Francois diagnosed Plaintiff with polysubstance dependence and prescribed him Chlordiazepoxide HCl.

28.    On a mental health intake form completed by PHS employee Anne Francois, LMSW, she noted that Mr. Latour suffers from bipolar personality disorder, a designated mental illness. She also recorded Mr. Latour's extensive past psychiatric history, including his previous hospitalizations for mental health treatment, and noted that he was currently experiencing depressive, manic, and panic/somatic symptoms.

29.    The mental health intake form also notes that: Plaintiff has a history of substance abuse and suicide attempts; Plaintiff's last suicide attempt occurred when he was going through drug detoxification; without his prescription medications, Plaintiff's mental illness "would likely cause significant functionality impairment"; Plaintiff decompensates quickly when he is off his medications; and that Plaintiff requires further treatment for his mental illness.

30.    Mr. Latour's treatment plan – which was developed and devised by PHS employee Anne Francois – included goals such as: reduce anxiety, normalize feelings, maintain stability, treat insomnia, prevent self-harm, and prevent decompensation.

31.    Because Mr. Latour tested positive for heroin, PHS employee Kenneth Powell placed Plaintiff on a six-day detoxification plan. Mr. Powell did not provide his title or any indication of how he was qualified to place a patient on a detoxification plan.

32.    A Mental Health Status Notification and Observation Transfer Form completed by Anne Francois on September 12, 2014, states that Mr. Latour exhibited "multiple risk factors" and that, in order to minimize his risk, he must be given his medications and should be placed in

C-71, the AMKC Mental Health Center.

33.   On September 12, 2014, Rikers Island jail personnel knew that Plaintiff posed a suicide risk, yet failed to place him on suicide watch or put into place any measures to prevent him from self-harm.

***Sept. 13-17, 2014: Defendants Fail to Follow the Treatment Plan and to Produce Mr. Latour***

34.   Despite the assessment of Mr. Latour's medical needs and explicit treatment plan, DOC inexplicably failed to transfer Plaintiff to C-71.  Instead, on September 13, 2014, Plaintiff was returned to AMKC Main Intake, where he was again placed in a holding cell with other inmates awaiting transfers to housing units.

35.   Again, he was not given bedding, a pillow, regular meals, clean clothes, or water.

36.   In a psychiatric assessment completed by Ngozi Nnadi, M.D., the doctor notes that Plaintiff was depressed, had no bed, and had a history of bipolar disorder that required inpatient treatment as recently as two weeks prior.  The assessment form states that Mr. Latour will be transferred to a mental observation ("MO") dormitory within the Otis Bantum Correctional Center ("OBCC"), another housing facility on Rikers Island.

37.   On September 13 and September 14, 2014, PHS employee Tracy Simpson-Mitchell, RN, failed to medicate Plaintiff when she had a duty to do so.  DOC employees failed to transfer Plaintiff to a housing facility when they had duties to do so.

38.   From September 14 through September 17, 2014, Mr. Latour remained at AMKC Main Intake without bedding, a pillow, regular meals, clean clothes, or water.  DOC never transferred him to a housing unit, and PHS failed to follow its own mental health treatment plan.

39.   On September 15, 2014, DOC failed to transport Mr. Latour to Manhattan Supreme Court for a scheduled appearance, causing him to miss his court date.  DOC employees had a

duty to produce Plaintiff on his court date.

40. On September 16, 2014, Nurse Karin Krebs informed defendants C.O. Hanson, Deputy Ruggerio, and P.A. Cooper that Mr. Latour had missed several doses of his prescription medication and informed Hanson, Ruggerio, and Cooper of Mr. Latour's "mental health status." P.A. Cooper failed to medicate him, as was the P.A.'s duty. C.O. Hanson and Deputy Ruggerio failed to place him in a housing unit for patients with mental illnesses, as was their duty.

### Sept. 18, 2014: Plaintiff's First Seizure

41. On September 18, 2014, Mr. Latour suffered a seizure at AMKC Main Intake.

42. Mr. Latour's seizure was a foreseeable result of DOC's failure to provide appropriate housing, as well as DOC and PHS's failure to medicate Plaintiff, provide necessary medical care, and to follow the health treatment plan.

43. Azmat Hasan, M.D., examined Mr. Latour after the seizure. Dr. Hasan knew that Mr. Latour had not been receiving his necessary prescription medications, despite previous orders to treat his mental illness, yet the doctor failed to take steps to ensure he would not miss any more doses of his medications, or to ensure that Plaintiff's mental health treatment plan would be followed.

44. After suffering a seizure, Mr. Latour was incomprehensibly returned to a holding cell in AMKC Main Intake. Again, he was not given bedding, a pillow, regular meals, clean clothes, or water.

### Sept. 19, 2014: Plaintiff Attempts Suicide and Suffers Additional Seizures

45. On September 19, 2014, Plaintiff met with medical staff who, upon information and belief, are PHS employees David Rosenberg, M.D., and Tommy Michael.

46. Plaintiff told Dr. Rosenberg and Mr. Michael that he planned to hang himself if he

remained in AMKC Main Intake.  Dr. Rosenberg and Mr. Michael wrote: "suicide watch not indicated at this time."  PHS staff knew that Mr. Latour posed a great risk to his own safety, yet failed to place him on suicide watch or protect him from self-harm, as were their duties.

47.   A few hours later, Mr. Latour, beset with fear, frustration, and anger, tied his shirt around his neck and attempted to hang himself.

48.   Defendants C.O. Anderson and Captain Swan brought Mr. Latour to the medical clinic after the attempted hanging.  They knew Plaintiff posed a serious risk to his own safety, yet they failed to take reasonable steps to ensure that he would be safe following his suicide attempt.

49.   Mr. Michael and PHS employee Curt Walker, P.A., examined Mr. Latour.  They failed to institute appropriate suicide precautions for him, which should have included, for example: transferring him to an acute psychiatric facility or keeping him under constant observation while he was in an isolated cell; checking him at irregular intervals twice every thirty minutes while he was at risk of suicide; and/or providing him with a safety smock and appropriate housing and bedding, among other precautions.

50.   Later that same day, Mr. Latour suffered another seizure at AMKC Main Intake.  As the medical team was transporting him on a stretcher, Plaintiff suffered yet another seizure.

51.   The seizures were the foreseeable consequences of the PHS employees' failure to properly medicate Plaintiff and the DOC employees' failure to properly house Plaintiff.

52.   DOC and PHS staff knew that Plaintiff had not been given his psychiatric medications, that he had already suffered seizures and a suicide attempt, that had been waiting in the intake area for many days in a row, and that DOC was refusing to house him.

53.   Plaintiff begged Defendants to remedy the situation, saying "Please, I just want to be housed tonight, I don't want to sleep in intake anymore."  DOC and PHS employees failed to

ensure that he was placed in a safe housing facility, as was their duty.

**Sept. 20-24, 2014: Plaintiff is Finally Housed, but Does Not Receive Medical Treatment**

54.    On September 20, 2014, Mr. Latour was transferred a housing unit.  Regardless, from September 20 until September 24, 2014, DOC and PHS staff failed to provide Plaintiff with his prescribed psychiatric medications or to follow his treatment plan.

**Conditions Throughout Plaintiff's Excessive Stay at AMKC Main Intake**

55.    From the time of Mr. Latour's arrival on Rikers Island on September 11, 2014, until September 24, 2014, Plaintiff was denied necessary medical treatment.  DOC and PHS staff repeatedly failed to give him doses of necessary prescription psychiatric medications and failed to properly administer methadone.

56.    Mr. Latour requested his medications repeatedly.  DOC correction officers – including the Individual DOC Defendants and the John Doe defendants – failed to bring him to the medical clinic to receive treatment.  The Medical Defendants failed to administer Plaintiff's necessary prescription medications.  As a result, Mr. Latour suffered seizures, severe sleep deprivation, anxiety, and other debilitating injuries.

57.    In addition to being denied medical treatment, during the ten days in which he was held at AMKC Main Intake, Mr. Latour was subjected to grossly unsafe, unsanitary and unclean conditions.  The holding cell was overcrowded, filthy, and infested with mice, vomit, feces, and cockroaches.

58.    Mr. Latour was not given a bed, pillow, sheets, or blankets.  He slept on the dirty floor in the cell.

59.    He was not given access to a shower or bath, and did not bathe for ten days.

60.    Mr. Latour was not given a toothbrush, and did not brush his teeth for ten days.

61.   Mr. Latour was not allowed a change of clean clothes, and wore the same dirty clothing for ten days.

62.   Mr. Latour was not given adequate or regular meals while held at AMKC Main Intake.

63.   Plaintiff did not have access to sufficient water or sanitary drinking conditions.  There was only one water bottle available for all detainees at AMKC Main Intake, and they were forced to share it.

64.   Mr. Latour begged correction officers, medical staff, and other DOC employees he encountered to help him.  He pleaded with them to be housed and properly medicated.

65.   Rather than fulfilling their duty to protect Mr. Latour, correction officers at AMKC Main Intake – including many of the Individual DOC Defendants as well as the John Doe Defendants – laughed, teased, and taunted him for his misfortune.  When the officers were not making a joke of Plaintiff's excruciatingly painful condition, they callously ignored his cries for help.

66.   The Medical Defendants failed to order suicide watch for Plaintiff, failed to institute appropriate suicide precautions for him, and failed to ensure that their recommended medical treatment plan was administered, despite knowing that Mr. Latour's medications had repeatedly not been given to him.

67.   PHS failed to have a police in place to ensure that, once a medical treatment plan is in place, it is followed by PHS staff.

68.   The Supervisory Defendants failed to ensure that DOC and PHS staff members were properly trained to care for detainees, such as Mr. Latour, who suffer from mental illnesses and require treatment while in DOC custody; failed to ensure that mentally ill detainees receive their essential medications in a regular and timely fashion while incarcerated; failed to ensure that

mentally ill detainees receive proper and appropriate housing at Rikers Island within 24 hours of their arrival on Rikers Island; failed to put into place adequate protections for detainees who do not receive adequate health care or housing; and failed to make sure that the treatment plan developed by medical staff within Rikers Island is accurately followed during a detainee's time in custody.

## DAMAGES

69.   As a direct and proximate result of the acts of defendants, Plaintiff suffered the following injuries and damages:

    a.   Violation of his rights under the Fourteenth Amendment to due process of law;

    b.   Violation of his rights under the Americans with Disabilities Act;

    c.   Violation of his rights under the Rehabilitation Act;

    d.   Violation of his rights under New York State Human Rights Laws;

    e.   Violation of his rights under New York City Human Rights Laws;

    f.   Physical pain and suffering;

    g.   Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, fright, horror, grief, shame, depression, loss of sleep, and increased levels of anxiety.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
(Against All Medical Defendants, Individual DOC Defendants, and Supervisory Defendants)

70.   The above paragraphs are here incorporated by reference.

71.   Defendants were deliberately indifferent to Plaintiff's serious medical needs when, knowing Plaintiff was suffering from a diagnosed psychiatric disorder and substance abuse withdrawal, they refused to attend to Plaintiff's serious medical needs and denied him proper and necessary care for his risk of self-harm.

72.     Defendants' deliberate indifference to Plaintiff's serious medical needs was the proximate cause of the mental anguish and physical pain suffered by Plaintiff.

73.     Defendants acted under color of law and conspired to deprive Plaintiff of his civil, constitutional and statutory rights to due process under the Fourteenth Amendment to the United States Constitution, and are liable to plaintiff under 42 U.S.C. § 1983.

74.     Plaintiff has been damaged as a result of Defendants' wrongful acts.

## SECOND CAUSE OF ACTION
42 U.S.C. § 1983
SUBSTANTIVE DUE PROCESS VIOLATION
(Against All Individual DOC Defendants, and Supervisory Defendants)

75.     Plaintiff incorporates by reference the above paragraphs.

76.     At the time of this incident, Plaintiff was a pretrial detainee.

77.     Defendants violated Plaintiff's right to due process by detaining him in unsanitary conditions and denying him basic needs, such as a legitimate housing space, for a lengthy period of time. *See Lareau v. Manson*, 651 F.2d 96 (2d Cir. 1981).

78.     Defendants acted under color of law and conspired to deprive Plaintiff of his civil, constitutional and statutory rights to due process under the Fourteenth Amendment to the United States Constitution, and are liable to Plaintiff under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION
42 U.S.C. § 1983
MUNICIPAL LIABILITY
(Against Defendant City)

79.     The above referenced paragraphs are here incorporated by reference.

80.     The City of New York is liable for the damages suffered by Plaintiff as a result of the conduct of its employees, agents, and servants.

81.     The City knew or should have known of its employees', agents, or servants' propensity

to engage in the illegal and wrongful acts detailed above.

82.   The City knew or should have known of the numerous and well-publicized failures of correction officers and health care providers at Rikers Island in delivering adequate health care services to pretrial detainees, as well as their failures to provide sanitary conditions to pretrial detainees.

83.   The aforesaid event was not an isolated incident.  The City has been aware for some time (from newspaper articles, internal and external reviews, investigations, lawsuits, notices of claim and inmate complaints) that the DOC has continually failed to provide adequate healthcare at Rikers Island and other City jails.  The City has insufficiently addressed or corrected DOC for inadequately performing.  The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights.  Despite such notice, the City has failed to take corrective action.  This failure and these policies caused the violations of Plaintiff's civil and constitutional rights, without fear of reprisal.

84.   The City knew or should have known that the personnel who caused Plaintiff's injury had a propensity for the type of conduct that took place in this case.  Nevertheless, the City failed to take corrective action.

85.   Defendants have failed to put in place policies to ensure that detainees are provided with recommended medical care and/or adequate conditions of confinement.

86.   The City has failed to take the steps to discipline, train, supervise or otherwise correct the improper, illegal conduct of the individual defendants in this and in similar cases involving misconduct.

87.   The above described policies and customs demonstrated a deliberate indifference on the part of policymakers of the City of New York to the constitutional rights of persons within New

York City, and were the cause of the violations of Plaintiff's rights here alleged.

88.   The City had actual and constructive knowledge of the constitutional deprivations but demonstrated deliberate indifference by failing to act.   The City damaged Plaintiff by its failure to properly train, supervise, discipline, review, remove, or correct the illegal and improper acts of their employees, agents or servants in this and in similar cases involving deliberate indifference to serious medical needs of prisoners.

89.   Plaintiff has been damaged as a result of the wrongful, deliberately indifferent and illegal acts of the City.

90.   The above described policies and customs demonstrate a deliberate indifference on the part of policymakers of the City to the constitutional rights of persons within New York City, and caused the violations of Plaintiff's constitutional rights.

91.   The City has damaged Plaintiff by their failure to properly train, supervise, discipline, review, remove, or correct the illegal and improper acts of their employees, agents or servants in this and in similar cases involving denial of mental health care.

### FOURTH CAUSE OF ACTION
VIOLATIONS OF THE ADA, THE RA, NEW YORK STATE HUMAN RIGHTS LAW, AND NEW YORK CITY HUMAN RIGHTS LAW
(Against the City, PHS, and the Supervisory Defendants)

92.   Plaintiff incorporates by reference the above paragraphs.

93.   The ADA, 42 U.S.C. § 12131 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794, Section 296 of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, and Title 8 of the New York City Human Rights Law, § 8-107, each prohibit discrimination by DOC and PHS employees against those with disabilities.

94.   Congress enacted the ADA upon a finding that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a

"serious and pervasive social problem."  42 U.S.C. § 12101(a)(2).

95.   Title III of the ADA states that "[i]t shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual licensing, or other arrangements, with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals."  42 U.S.C. § 12182(b)(1)(A)(iii).  Under Title III of the ADA, PHS is mandated not to discriminate against any qualified individual "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation."  42 U.S.C. § 12182(a).

96.   Section 504 of the Rehabilitation Act states: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency."  29 U.S.C. § 794.

97.   Article 15 of the New York State Executive Law and Article 8 of the Title 8 of the New York City Human Rights Law make it unlawful for the provider of a public accommodation the to withhold or deny any of the accommodations, advantages, facilities or privileges to a person with a disability.

98.   Defendant City of New York is a public entity that receives federal funding and is subject to Title II of the ADA and Section 504 of the Rehabilitation Act.  Title II of the ADA applies to jail "services, programs, or activities."  42 U.S.C. § 12132.  Furthermore, *respondeat superior* liability applies to Title II claims.  The City of New York is therefore liable under Title II of the ADA for the unlawful acts of its private entity agent.

99.   Title III of the ADA, 42 U.S.C. §§ 12181-89, applies to private entities.  42 U.S.C. § 12181(6).  Defendant Prison Health Services is a corporation involved in interstate commerce that, at the time of Plaintiff's detention, operated for-profit business establishments providing healthcare within New York City jails, including at Rikers Island.  Prison Health Services therefore operated a place of public accommodation at the time of the incident, and is subject to Title III of the ADA.

100.   Mr. Latour was a "qualified individual" with a mental illness or disability, in that he has diagnosed mental disabilities that substantially limit his major life activities.  He was otherwise qualified to participate in or receive the benefit of Defendants' services, programs, or activities, including DOC's and PHS's jail services, programs, or activities, but he was excluded from participation in or denied the benefits of those services and activities by reason of his disability.

101.   Defendants knew that Plaintiff suffered from a mental disability.

102.   Mr. Latour was entitled to the same correctional and health services that Defendant provides to other non-disabled persons.

103.   Defendants unlawfully discriminated against Plaintiff due to his disability and failed to provide reasonable accommodation by failing to provide him with his essential prescription psychiatric medications; failing to properly administer methadone after DOC staff undertook the task of putting Plaintiff through detoxification; and failing to house Plaintiff in a dormitory where his disability could be properly monitored and treated.

104.   Defendant City of New York failed to have in place proper policies or protocols to require employees to adequately monitor and treat persons suffering from serious disabilities in the jail.  Further, the City failed to ensure its employees and contractors properly evaluated persons suffering from serious medical conditions to ensure that their medical condition was not

deteriorating.  As a result of the City's failures, persons with qualified disabilities are being treated unfairly and discriminatorily.

105. As a direct and proximate cause of these acts and omissions, Defendants have discriminated against Mr. Latour on the basis of his disability and have damaged him.

## FIFTH CAUSE OF ACTION
### NEGLIGENT HIRING, TRAINING, DISCIPLINE, & RETENTION
(Against the City)

106.  The above paragraphs are here incorporated by reference.

107.  The City of New York owed a duty of care to Plaintiff to prevent the physical and mental abuse sustained by Plaintiff.

108.  The City of New York owed a duty of care to Plaintiff because under the same or similar circumstances a reasonable, a prudent and careful person should have anticipated an injury to Plaintiff or those in a position similar to Plaintiff's as a result of this conduct.

109.  Defendant officers and medical staff were incompetent and unfit for their positions.

110.  The City of New York and knew or should have known through exercise of reasonable diligence that the defendant officers and medical staff were potentially dangerous.

111.  The City of New York's negligence in hiring and retaining the defendant officers and medical staff proximately caused Plaintiff's injuries.

112.  Upon information and belief, because of the City's negligent hiring and retention of the defendant officers and medical staff, Plaintiff incurred damages described above.

## SIXTH CAUSE OF ACTION
### NEGLIGENCE
(Against the Medical Defendants and the Individual DOC Defendants)

113.  The above paragraphs are here incorporated by reference.

114.  Defendants owed a duty of care to Plaintiff as an inmate at Rikers Island.

115. Defendants breached their duty to Plaintiff by denying him access to adequate and necessary medical and mental health care, failing to provide medical and mental health treatment, failing to house him in a facility where he could receive necessary medical treatment, and/or otherwise neglecting his medical and mental health needs.

116. Defendants, their officers, agents, servants and employees, were responsible for Plaintiff's physical and emotional injuries during this period of time.

117. As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiff sustained the damages described above.

## SEVENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against the Medical Defendants and the Individual DOC Defendants)

118. The above paragraphs are here incorporated by reference.

119. Defendants engaged in extreme and outrageous conduct intentionally and recklessly, causing Mr. Latour to suffer severe emotional distress.

120. Defendants are liable to Plaintiff for the intentional infliction of emotional distress.

121. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages described above.

## EIGHTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Against the Medical Defendants and the Individual DOC Defendants)

122. The above paragraphs are here incorporated by reference.

123. Defendants are liable to Plaintiff for the negligent infliction of emotional distress.

124. Defendants, their officers, agents, servants, and employees were responsible for the negligent infliction of emotional distress.

125. As a direct and proximate result of the misconduct and abuse of authority detailed

above, Plaintiff sustained the damages described above.

## NINTH CAUSE OF ACTION
N.Y. STATE CONST., ART. I § 12
(Against the Medical Defendants and the Individual DOC Defendants)

126.  The above paragraphs are here incorporated by reference.

127.  By denying Plaintiff adequate medical care, causing him to suffer two seizures and attempt to take his own life, Defendants deprived him of rights, remedies, privileges, and immunities guaranteed to every New Yorker by Article I § 12 of the New York Constitution.

128.  Defendants, their officers, agents, servants, and employees, were responsible for the deprivation of Mr. Latour's state constitutional rights.

129.  The officer defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as DOC officers.  Said acts by officer defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly and with the specific intent to deprive plaintiff of his constitutional rights secured by the Constitution of the State of New York.

130.  As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiff sustained the damages described above.

## TENTH CAUSE OF ACTION
RESPONDEAT SUPERIOR
(Against the City, PHS, and the Supervisory Defendants for State Law Violations)

131.  The above paragraphs are here incorporated by reference.

132.  The tortious acts of the Individual DOC Defendants and the Medical Defendants were undertaken within the scope of their employment by Defendants City of New York and PHS, under the supervision of the Supervisory Defendants, and in furtherance of the Defendant City of

New York's interest.

133. As a result of Defendants' tortious conduct in the course of their employment and in furtherance of the business of Defendant City of New York and PHS, Plaintiff was damaged.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, as follows:

A.      In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B.      Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C.      Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D.      Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:      February 26, 2016
            Brooklyn, New York

                              Respectfully yours,

                              STOLL, GLICKMAN & BELLINA, LLP

                              _____
                              Amy E. Robinson, Esq.
                              475 Atlantic Avenue, 3rd Floor
                              Brooklyn, NY  11217
                              (718) 852-3710
                              arobinson@stollglickman.com
                              *Attorneys for Plaintiff*